1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT
9                     CENTRAL DISTRICT OF CALIFORNIA
10

11   LOS ANGELES SMSA LIMITED            Case No. 2:16-cv-04954-FLA (SKx)
12   PARTNERSHIP, a California limited
     partnership dba VERIZON WIRELESS,   **FINDINGS OF FACT AND**
13                                       **CONCLUSIONS OF LAW**
                         Plaintiff,      **FOLLOWING BENCH TRIAL**
14
          v.
15
16   CITY OF LOS ANGELES,                Date:         May 25, 2021
                                         Time:         8:30 a.m.
17                       Defendant.      Courtroom:    6B
18
19
20                                **RULING**

21        The court finds the South Los Angeles Area Planning Commission's ("South

22   LA APC") December 3, 2018 decision to deny Plaintiff Los Angeles SMSA Limited

23   Partnership's (doing business as Verizon Wireless) ("Plaintiff" or "Verizon") revised

24   application (the "2017 Project Application") to place, install, construct, and operate an

25   unmanned wireless telecommunications facility at 2512 South Robertson Boulevard,

26   Los Angeles, California (the "proposed Facility" or the "Hillsboro Facility") violated

27   47 U.S.C. § 332(c)(7)(B)(i)(II) of the federal Telecommunications Act of 1996 (the

28   "TCA") by prohibiting Verizon's ability to fill a significant gap in its network

                                         1

coverage and its provision of 4G LTE wireless services.  In particular, the court finds Plaintiff presented sufficient evidence at trial to establish by a preponderance of the evidence that Verizon has a "significant gap" in its own service coverage within the geographic area that would be covered by the proposed Facility.

Accordingly, for the reasons set forth herein, the court GRANTS Judgment in Plaintiff's favor and ISSUES a Writ of Mandate under Cal. Code Civ. Proc. § 1094.5 ORDERING Defendant the City of Los Angeles ("Defendant" or the "City") to set aside, vacate, and rescind the Denial Decision and further ISSUES an Injunction REQUIRING the City to issue promptly all permits and other approvals, along with all other permits and environmental review approval authorizations necessary, to allow Verizon to proceed with the construction and operation of the proposed Facility, as set forth in the 2017 Project Application.

Plaintiff shall file a proposed Judgment within 21 days of this ruling, which accurately states the court's rulings and complies with all statutory requirements and court rules, including Fed. R. Civ. P. 65(d).

## **BACKGROUND** [1]

Verizon brings this action to challenge the City's December 3, 2018 decision to deny the 2017 Project Application (the "Denial Decision").  Trial Ex. 18.  The proposed Facility consists of: (a) a maximum 52-feet high, faux mono-eucalyptus tree; (b) a maximum of twelve (12) panel antennas that are 8-feet in height; (c) eighteen (18) new radios; (d) three (3) new wireless raycaps; and (e) faux eucalyptus tree branches and "socks" containing antennas, radios, and raycaps.  Trial Ex. 16 at 2.

/ / /

---

[1] In the Final Pretrial Conference Order, dated May 25, 2021, the court ordered admitted all facts marked as undisputed in the Statements of Genuine Disputes of Material Facts filed by the parties in support of their cross-motions for summary judgment (Dkts. 73, 75-4).  Dkt. 121 § 5.  The following background facts, therefore, are not in dispute.

In November 2014, Plaintiff submitted a Master Land Use Application to the Los Angeles Department of City Planning (the "LADCP") seeking approval of a conditional use permit to build and operate the proposed Facility (the "2014 Project Application"). Dkt. 75-4 ¶ 1. City Zoning Administrator Jack Chiang ("ZA Chiang") denied the 2014 Project Application on March 10, 2016, which Plaintiff appealed. *Id.* ¶ 2. On June 7, 2016, the South LA APC held an appeal hearing on the 2014 Project Application, at which time it adopted the findings of ZA Chiang and denied the appeal. *Id.* ¶ 3. The South LA APC issued its written determination letter denying the 2014 Project Application on June 20, 2016. *Id.* ¶ 4; Trial Ex. 2:001.

Plaintiff filed the Complaint in this action on July 7, 2016, challenging the City's denial of the 2014 Project Application. Dkt. 1. On March 9, 2017, the City and Verizon participated in a mandatory settlement conference with Magistrate Judge Steve Kim, which resulted in a tentative settlement of the action. Dkt. 27. Under the settlement agreement, Verizon agreed to prepare and submit a revised application for a conditional use permit, the 2017 Project Application, and to dismiss the Complaint if the redesigned facility was approved through the City's planning process. *Id.* ¶¶ 2-3. Verizon filed the 2017 Project Application with the LADCP on July 27, 2017. Trial Ex. 3; Dkt. 75-4 ¶ 8.

On July 6, 2018, Associate Zoning Administrator David Weintraub ("ZA Weintraub") issued a determination letter approving the 2017 Project Application. Trial Ex. 16. On July 16, 2018, a group of 214 residents and 53 businesses filed an appeal challenging ZA Weintraub's approval of the 2017 Project Application (the "2018 Appeal"). Dkt. 75-4 ¶ 10, Trial Ex. 17. The South LA APC held a public hearing on October 30, 2018, at which time it denied the 2017 Project Application and granted the 2018 Appeal. Dkt. 75-4 ¶ 11. The South LA APC issued its written determination letter on December 3, 2018. Trial Ex. 18.

Plaintiff filed the operative First Amended Complaint ("FAC") on December 18, 2018, asserting four causes of action for: (1) violation of 47 U.S.C. §

332(c)(7)(B)(iii) ("§ 332(c)(7)(B)(iii)") for denial not based on substantial evidence; (2) violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) ("§ 332(c)(7)(B)(i)(II)") for unlawful prohibition of service; (3) violation of 47 U.S.C. § 332(c)(7)(B)(i)(I) ("§ 332(c)(7)(B)(i)(I)") for unreasonable discrimination; and (4) petition for writ of mandate under Cal. Code Civ. Proc. § 1094.5.  Dkt. 49.

Verizon contends the Denial Decision violated the TCA and seeks: (a) a declaration that the Denial Decision violated the TCA and the Federal Communications Commission's ("FCC") Declaratory Ruling and Third Report and Order (FCC 18-133), dated September 26, 2018 ("the September 2018 FCC Ruling"); (b) an injunction precluding the City from refusing to issue all relevant and necessary permits for the wireless telecommunication facilities at the South Robertson Boulevard site, as well as all other permits and environmental review approval authorizations necessary for the operation of Verizon's telecommunications facilities at that location; and (c) a writ of mandate under California law ordering the City to rescind its denial of the 2017 Project Application and to issue all relevant and necessary permits and environmental review approvals for the wireless telecommunications facilities at the South Robertson Boulevard site, as well as all other permits and environmental review approval authorizations necessary for the operation of Verizon's telecommunications facilities at that location.  FAC ¶¶ 3, 6.

## PROCEDURAL POSITION OF THE ACTION

On September 30, 2019, the court dismissed Plaintiff's third cause of action for violation of § 332(c)(7)(B)(i)(I) without prejudice, pursuant to stipulation by the parties.  Dkt. 71.  On September 1, 2020, the court granted partial summary judgment in Defendant's favor on Plaintiff's first cause of action for denial not based on substantial evidence under § 332(c)(7)(B)(iii).  Dkt. 85 at 32.  The only remaining causes of action are Plaintiff's second cause of action for effective prohibition of service under § 332(c)(7)(B)(i)(II) and fourth cause of action for a petition for writ of mandate under Cal. Code Civ. Proc. § 1094.5.

4

Section 332(c)(7)(B)(i)(II) states in relevant part:

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof … (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

47 U.S.C. § 332(c)(7)(B)(i)(II).  The Ninth Circuit has recognized that a locality can violate the effective prohibition clause of the TCA if it prevents a wireless provider from closing a "significant gap" in service coverage.  *T-Mobile USA Inc. v. City of Anacortes*, 572 F.3d 987, 995 (9th Cir. 2009).  In evaluating such a claim, courts in this circuit apply "a two-pronged analysis requiring (1) the showing of a 'significant gap' in service coverage and (2) some inquiry into the feasibility of alternative facilities or site locations" (the "*Anacortes* test").[2]  *Id.*

On September 1, 2020, the court granted partial summary judgment in Plaintiff's favor on the second element of the *Anacortes* test, holding Verizon made a prima facie showing that the proposed Facility was the "least intrusive means" of filling the purported significant gap in coverage and that the City failed to rebut that showing.  Dkt. 85 at 27-31.  The court denied the parties' cross-motions for summary judgment on the first element of the *Anacortes* test and on the second cause of action as a whole.  *Id.* at 32.  Given the parties' apparent agreement that the fourth cause of

---

[2] In the court's September 1, 2020 order, the court additionally denied the parties' cross-motions for summary judgment on the issue of whether the Denial Decision was an unlawful prohibition of service under the standard established by the September 2018 FCC Ruling.  Dkt. 85 at 32.  Plaintiff's trial brief states: "[w]hile Verizon believes that the FCC Ruling applies to the Denial Decision and Verizon would prevail under the FCC's standard for the effective prohibition claim, Verizon will not pursue this argument in this case and will only brief and raise at trial the issue of a significant gap under the 1996 Telecommunications Act (TCA) and the Ninth Circuit standard."  Dkt. 91 at 7 n.1.  Accordingly, the court will limit its analysis to the Ninth Circuit standard under the *Anacortes* test.

action for a writ of mandamus was derivative of the first and second causes of action, the court denied the parties' cross-motions as to the fourth cause of action.  *Id.*

This action came to trial on May 25, 2021 on the sole remaining issue of whether Plaintiff has demonstrated the existence of a "significant gap" in service coverage.  After evaluating the evidence in the record and presented at trial, including making determinations of credibility, the court issues the findings of fact and conclusions of law set forth below.[3]

## STANDARD OF REVIEW

**I.    The Ninth Circuit's Standard for a "Significant Gap" in Service Coverage**

"[A] significant gap in service (and thus an effective prohibition of service) exists whenever a provider is prevented from filling a significant gap in its own service coverage."  *MetroPCS, Inc. v. City & Cnty. of San Francisco*, 400 F.3d 715, 733 (9th Cir. 2005) (italics omitted), *abrogated in part on unrelated grounds in T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 299 (2015).  "'[S]ignificant gap' determinations are extremely fact-specific inquiries that defy any bright-line legal rule."  *Id.*  "[T]he relevant service gap must be truly 'significant' and 'not merely individual "dead spots" within a greater service area.'"  *Id.* at 733 n.10.  "[T]he provider has the burden of showing that the denial of its proposal will effectively prohibit the provision services."  *Anacortes*, 572 F.3d at 997-98.

Courts consider a "wide range of context-specific factors" in assessing the significance of alleged coverage gaps, including the nature and character of the area, the number of potential users in that area who may be affected by the alleged lack of

---

[3] At the Final Pretrial Conference, the court deferred ruling on Plaintiff's objections to letters and other communications in the Administrative Record and evidence filed in support of Defendant's Motion for Summary Judgment related to papers authored by residents concerning the strength of their respective phone signals.  Dkts. 112, 120. Plaintiff withdrew its objections at trial and these exhibits were admitted into evidence.

service, whether facilities are needed to improve weak signals or to fill a complete void in coverage, whether gaps pose public safety risks, and the effects of gaps on roads, highways, railways, and commercial districts. *Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*, 583 F.3d 716, 727 (9th Cir. 2009). Inadequate or unreliable in-building service can be sufficient to show the existence of a significant gap in coverage. *T-Mobile W. Corp. v. City of Huntington Beach*, No. 2:10-cv-02835-CAS (Ex), 2012 WL 4867775, at *4 (C.D. Cal. Oct. 10, 2012).

While the Ninth Circuit has not specifically ruled on the applicable standard for review regarding a "significant gap," district courts in this circuit and appellate courts in other circuits have held that in reviewing a claim under § 332(c)(7)(B)(i)(II), "[t]he administrative record is reviewed de novo" and "there is no deference to local findings." *Airtouch Cellular v. City of El Cajon*, 83 F. Supp. 2d 1158, 1163-64 (S.D. Cal. 2000); *T-Mobile NE LLC v. Loudoun Cnty. Bd. of Supervisors*, 748 F.3d 185, 192 (4th Cir. 2014) ("the issue of whether [a locality] has prohibited or effectively prohibited the provision of wireless services is determined de novo by the district court") (internal citations omitted); *APT Pittsburgh Ltd. P'ship v. Pa. Twp. Butler City of Pa.*, 196 F.3d 469, 475 (3d Cir. 1999) ("[W]hether a state's denial of an application to construct a personal wireless service facility 'has the effect of prohibiting the provision of personal wireless services' … is to be made de novo by a reviewing court that will not necessarily be limited to the record compiled by the state or local authority."). "[I]n evaluating an effective prohibition claim, district courts are free to consider additional evidence not in the administrative record." *ColfaxNet, LLC v. City of Colfax*, 2:19-cv-02167-WBS-CKD, 2020 WL 4818895, at *3 (E.D. Cal. Aug. 19, 2020) (quoting *Green Mountain Realty Corp. v. Leonard*, 688 F.3d 40, 49 (1st Cir. 2012).

## II.   Plaintiff's Argument

Plaintiff contends it should prevail on its effective prohibition claim because Verizon made a prima facie showing of a significant gap during the 2018 Appeal,

whereas the South LA APC improperly denied the 2017 Application without rebutting or questioning Verizon's evidence and testimony.  Dkt. 91 (Pl. Op. Trial Br.) at 9-13.

As stated, the *Anacortes* test involves a two-pronged analysis under which the provider must show: (1) a "significant gap" in service coverage; and (2) "the lack of available and technologically feasible alternatives."  *Anacortes*, 572 F.3d at 995.  With respect to the second prong of the *Anacortes* test:

> [1] A provider makes a prima facie showing of effective prohibition by submitting a comprehensive application, which includes consideration of alternatives, showing that the proposed WCF is the least intrusive means of filing a significant gap.  [2] A locality is not compelled to accept the provider's representations.  However, when a locality rejects a prima facie showing, it must show that there are some potentially available and technologically feasible alternatives. [3] The provider should then have an opportunity to dispute the availability and feasibility of the alternatives favored by the locality.

*Id.* at 997-98.

According to Plaintiff, the following language from *Anacortes* demonstrates the Ninth Circuit intended for the same three-step process to apply to the first prong of the *Anacortes* test:

> Because we conclude that the City failed to show that there were any available alternative sites, we need not determine whether the proposed alternative sites would have provided sufficient coverage to close the gap in T-Mobile's coverage.  We would address this issue in the same manner as we addressed the availability of alternative sites. The provider's application would have to show how the proposed site would close the gap, supported by data showing the coverage afforded by other sites.  The locality could then investigate and determine whether the provider's representations were sound and persuasive.

The provider would then have an opportunity to reply to the locality's challenges.

Dkt. 91 (Pl. Op. Trial Br.) at 11 and Dkt. 103 (Pl. Reply Trial Br.) at 5-6 (quoting *Anacortes*, 572 F.3d at 998-99).

The quoted language however, concerns discussion of "whether the proposed alternative sites would have provided sufficient coverage to close the gap in T-Mobile's coverage," which relates to the "the lack of available and technologically feasible alternatives" under the second prong of the *Anacortes* test. *Anacortes*, 572 F.3d at 998-99. *Anacortes* neither discussed nor considered the applicable standard for the first prong, as the defendant in that case conceded there was a significant gap in coverage. *Id.* at 995, 999.

The court, therefore, disagrees with Plaintiff's contention that the same three-step process applies to the first prong of the *Anacortes* test and will evaluate the existence of a significant gap after reviewing the evidence de novo.

### III. Defendant's Arguments that There Is No "Significant Gap" Because Verizon's Existing Network Provides Traditional Voice, Text Messaging, and Email Services

Defendant contends Verizon cannot establish a significant gap in its coverage because the evidence in the record establishes Verizon's existing network provides reliable outdoor and in-vehicle coverage for traditional voice, text messaging, and email services throughout the entire coverage area. Dkt. 98 (Def. Opp. Trial Br.) at 21 (citing Trial Ex. 27:007 (Afflerbach Decl.) ¶ 28). According to the City, the Ninth Circuit held in *Palos Verdes*, 583 F.3d at 728, that there was no effective prohibition where a wireless carrier's "existing network was, at the very least, functional." Dkt. 98 (Def. Opp. Trial Br.) at 18-19. Defendant misreads the holding of *Palos Verdes*.

In *Palos Verdes*, 583 F.3d at 726-27, the district court granted summary judgment in favor of the wireless provider, Sprint PCS Assets, L.L.C. ("Sprint"), on its effective prohibition claim, finding Sprint had established the existence of a

significant gap, in relevant part, because Sprint's "existing wireless coverage in the City was 'based on obsolete facilities needing replacement.'"  The Ninth Circuit reversed the district court's grant of summary judgment, in relevant part, because the record did not establish the obsolescence of Sprint's existing facilities as a matter of fact.  *Id.* at 728.  As the Ninth Circuit explained, Sprint "not only failed to explain why the existing facilities were no longer usable, but they actually undermined that position by pointing out that those facilities were currently serving some four thousand residents and acknowledging at the public hearing that Sprint service was generally available in the City."  *Id.*  As the evidence in the record established that the "existing network was, at the very least, functional," the Ninth Circuit reversed the grant of summary judgment for the provider on this basis.  *Id.*

*Palos Verdes* does not stand for the proposition that a provider cannot demonstrate at trial the existence of a significant gap or an effective prohibition of service if its network is "at the very least, functional," and holds only that a wireless provider is not entitled to summary judgment where there are disputed issues of material fact.  *Id.* at 720 (citing Fed. R. Civ. P. 56(c)) ("Summary judgment is appropriate only if the pleadings, the discovery, disclosure materials on file, and affidavits show that there is <u>no genuine dispute</u> as to any material fact and that the moving party is entitled to judgment as a matter of law.") (emphasis added).  Here, in contrast, as explained below, Plaintiff has proven at trial the existence of a significant gap in service coverage.  Accordingly, the cited portion of *Palos Verdes* is inapposite.

Pursuant to § 332(c)(7)(B)(i)(II), "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  For purposes of that paragraph, the term "personal wireless services" is defined to mean "commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services."  *Id.* at § 332(c)(7)(C)(i).  Defendant offers no legal authority to

10

establish that only voice, text messaging, and email services qualify as "personal wireless services" or "commercial mobile services" under § 332(c)(7), or that the TCA does not also prevent the prohibition of other services including high-speed internet.  The legislative history of the TCA suggests otherwise.

Congress enacted the TCA to "encourage the rapid deployment of new telecommunications technologies."  S. 652, 104th Cong. § 104 (1996) (enacted) at Synopsis; *Palo Verdes*, 583 F.3d at 721.  It would be inconsistent with Congress's stated intent in enacting the TCA for the court to read additional limitations into the definition of "personal wireless services" and limit § 332(c)(7) to voice, text messaging, and email services.  Accordingly, the court holds that § 332(c)(7)(B)(i)(II) does not only prevent the City from prohibiting traditional voice, text, and email services, but also prevents the City from effectively prohibiting Verizon from closing a significant gap in its 4G LTE services.

## **FINDINGS OF FACT** [4]

### IV.    **The Parties' Evidence Regarding Coverage**

The facts in this action are largely not in dispute.  Both Plaintiff's expert witness, Brian Blanchard ("Blanchard"), and Defendant's expert witness, Lee Afflerbach ("Afflerbach"), testified at trial and agreed that wireless signal strength is measured in decibel-milliwatts ("dBm"), with higher negative numbers representing weaker signals.  For example, a signal of -85 dBm represents a stronger signal and more reliable wireless service than a signal of -95 dBm.

Blanchard and Afflerbach further testified at trial and agreed that: (1) a signal of -85 dBm or stronger represents good, reliable in-building and in-vehicle 4G-LTE wireless service; (2) a signal between -95 dBm and -86 dBm represents good, reliable

---

[4] The court finds that the following facts are supported by evidence in the record.  The characterization of a finding as one of "fact" or "law" is not controlling.  To the extent a finding is characterized as one of "law" but is more properly characterized as one of "fact" (or vice versa), substance shall prevail over form.

in-vehicle 4G-LTE wireless service as well as some level of in-building service, with -95 dBm set as the telecommunications industry's standard for in-vehicle coverage; and (3) a signal between -105 dBm and -96 dBm represents reliable outdoor 4G-LTE wireless service and less reliable in-vehicle service.  Trial Ex. 25:009 (Blanchard Decl.) ¶ 20; Trial Ex. 29:009-29:010.  At trial, Afflerbach testified that -105 dBm is "the lowest or near the end of signals that can be received on a cell phone" and is "where the phone is just starting to receive … reliable signals."  Afflerbach's expert report similarly states that "[w]here the signal is lower than -105 dBm, [Verizon's network] may not provide reliable in-vehicle or outdoor coverage…."  Trial Ex. 29:010.

The parties submitted three maps regarding Verizon's 4G LTE network coverage in the geographic area near the proposed Facility.  First, Plaintiff submitted a radio frequency ("RF") coverage map of Verizon's predicted RF signal strength, which Plaintiff created in 2018 using its RF prediction tool, Atoll.  Trial Ex. 25:005-25:007 (Blanchard Decl.) ¶¶ 11-13; Trial Ex. 26:002 (Blanchard Decl. Attach. 1, "Plaintiff's 2018 Coverage Map").

/ / /

/ / /

/ / /



Trial Ex. 26:002 (Plaintiff's 2018 Coverage Map).

Second, Plaintiff submitted a map that shows the results of a drive test performed by a Verizon system performance RF engineer in 2018.  Trial Ex. 24:009, 24:015 ("Plaintiff's Drive Test Map").

/ / /

/ / /

/ / /



Trial Ex. 24:015 (Plaintiff's Drive Test Map).[5]

Although Plaintiff did not present the underlying data from its drive test for the court's review, a count of the hexagons in Plaintiff's Drive Test Map shows: (1) 5.9% of signals were -85 dBm or stronger; (2) 23.7% of signals were from -96 dBm to -85 dBm; (3) 49.9% of signals were from -96 dBm to 105 dBm; and (4) 20.5% of signals were at -106 dBm or weaker. *See* Trial Ex. 24:015.

Third, Defendant submitted a map that shows the results of a drive test Afflerbach conducted between March 8 and March 10, 2021.  Trial Ex. 29:010 (Afflerbach Decl. Ex. B, "Defendant's Drive Test Map").

---

[5] According to Plaintiff, "[t]he white dots or areas … represent the complete lack of any effective Verizon network signal."  Trial Ex. 24:009.  The court interprets this statement to mean that the white dots represent recorded signals below -105 dBm.



Trial Ex. 29:010 (Defendant's Drive Test Map).[6]

A review of Defendant's drive test data shows: (1) 10.7% of the recorded signals were -85 dBm or stronger; (2) 24.7% of the recorded signals were from -86 dBm to -95 dBm; (3) 44.5% of the recorded signals were from -96 dBm to -105 dBm;

---

[6] Defendant's drive test recorded multiple areas with signals below -105 dBm, which are not marked on Defendant's Drive Test Map.  Trial Ex. 29:010.

1  and (4) 20.1% of the recorded signals were weaker than -106 dBm. *See* Trial Ex.

2  29:026-29:077.[7]  These figures are comparable to the results of Plaintiff's drive test.[8]

3         All three maps show the areas near Verizon's existing Oxen Corner and Castle

4  Heights facilities, to the south and northeast respectively, had signals strengths of -95

5  dBm to -86 dBm (marked in yellow in Plaintiff's maps and in dark cyan in

6  Defendant's map) or stronger (marked in green in Plaintiff's maps and in dark blue in

7  Defendant's map).  Similarly, all three maps show large areas near the proposed

8  "Hillsboro" Facility with signal strengths of -96 dBm or lower (marked in cyan and

9  white in Plaintiff's maps and in light cyan or unmarked in Defendant's map), with

10  signal strengths below -105 dBm in the areas immediately to the east and west of the

11  proposed Facility and around Hillsboro Avenue to the northwest.

12        As stated, Defendant's expert witness, Afflerbach, testified that -95 dBm is the

13  target level generally used by the telecommunications industry for in-vehicle coverage

14  and that -105 dBm is "the lowest or near the end of signals that can be received on a

15  cell phone" and "where the phone is just starting to receive … reliable signals."  Thus,

16  the parties' drive test maps and data demonstrate that approximately two-thirds of the

17  geographic area does not meet the telecommunications industry's standard for in-

18  vehicle coverage and that one-fifth of the area lacks reliable in-vehicle or outdoor

19

20  _____

21  [7] Defendant's report states that the full list of data includes data from "extraneous
    areas outside the target [area]." Trial Ex. 29:010.  As the data appears to have been

22  collected within, or in areas contiguous to, Defendant's target area and as the court has
    no basis to determine which data falls outside the specified area, the court's

23  calculations are based on the full data set provided by the City.

24  [8] Plaintiff's Drive Test Map covers a slightly different geographic area than
    Defendant's Drive Test Map. *Compare* Trial Ex. 24:015 (Plaintiff's Drive Test Map)

25  *with* Trial Ex. 29:010 (Defendant's Drive Test Map).  In particular, Plaintiff's drive

26  test appears to have occurred over a smaller geographic area and did not measure
    signal strength closer to Verizon's existing Oxen Corner and Castle Heights facilities,

27  where Afflerbach recorded the highest concentration of signals of -85 dBm or

28  stronger.

coverage altogether.  Based on Defendant's data, only one-tenth of the geographic area has good, reliable in-building coverage (shown in green in Plaintiff's Drive Test Map and in dark blue in Defendant's Drive Test Map), with that coverage clustered near the existing Oxen Corner and Castle Heights facilities.

## V.   Relevant Factors to Assess the Significance of Gaps in Coverage

As stated, *Palos Verdes*, 583 F.3d at 727, makes clear that courts consider a "wide range of context-specific factors" in assessing the significance of alleged coverage gaps, including the nature and character of the area and the number of potential users in that area who may be affected by the alleged lack of service, whether facilities are needed to improve weak signals or to fill a complete void in coverage, whether gaps pose public safety risks, and the effects of gaps on roads, highways, railways, and commercial districts.  The court will discuss the most relevant of these factors below.

### A.   In-Building Coverage

The geographic area around the proposed Facility is a residential neighborhood within the City of Los Angeles, with approximately 650 residential structures, 27 multi-family structures, 55 commercial buildings, 15 street segments, and a school. Dkt. 91 (Pl. Op. Trial Br.) at 17.  Based on demographic data compiled by the Los Angeles Times, Plaintiff estimates that approximately 1,680 people live within the approximate coverage footprint of the proposed Facility.  *Id.* at n.17.

Courts have held that "a gap in a provider's in-home coverage that consists of more than a few isolated pockets of inadequate in-home coverage suffices to show a significant gap exists."  *T-Mobile W. Corp. v. City of Agoura Hills*, 2:09-cv-09077-DSF (PJWx), 2010 WL 5313398, at *8 (C.D. Cal. Dec. 20, 2010).  "[W]here coverage holes are large or frequent in number and size, and extend to the interior of buildings in urban areas or to a significant number of residences in well-populated areas, such coverage holes *are* actionable under the TCA."  *MetroPCS Inc. v. City & Cnty. of San*

17

*Francisco* (*MetroPCS II*), 4:02-cv-03442-PJH, 2006 WL 1699580, at *10 (N.D. Cal. June 16, 2006), *on remand from* 400 F.3d 715 (italics in original).

The parties' drive test maps and data demonstrate that only approximately 10% of the relevant area currently has coverage of -85 dBm or stronger, which both parties' experts testified represents good, reliable in-building coverage.  Approximately 30-35% of the relevant area has coverage of -86 dBm to -95 dBm, which the experts testified represents good in-vehicle coverage and some level of in-building coverage.  Approximately 65-70% of the relevant area, particularly in the areas to the north and west of the proposed Facility, has coverage of -96 dBm or weaker, which both experts agreed is below the signal strength necessary for reliable in-building coverage.  Defendant's own data shows that approximately 20% of the relevant area had signals weaker than -105 dBm, which Afflerbach testified is "the lowest or near the end of signals that can be received on a cell phone" and "where the phone is just starting to receive … reliable signals."  Considering that approximately two-thirds of the area lack reliable in-building coverage and that approximately one-fifth of the area lacks reliable signal altogether, the evidence demonstrates there is a significant gap in Verizon's 4G LTE network coverage.

In its Opposition Trial Brief, Defendant argues that Defendant's 2021 Drive Test "confirmed what Verizon's drive test and propagation maps show – that outdoor and in-vehicle coverage is present throughout the entire coverage area and that large areas within the coverage area have at least some level of in-building coverage."  Dkt. 98 (Def. Opp. Trial Br.) at 21-22 (citing Trial Ex. 27 (Afflerbach Decl.)).  This assertion is not supported by Defendant's expert report or the evidence in the record.  *See* Trial Ex. 29:010, 29:026-29:077 (recognizing Afflerbach recorded signals lower than -105 dBm, where Verizon's network "may not provide reliable in-vehicle or outdoor coverage").

Defendant also contends the lack of a significant gap is demonstrated by the declarations of Verizon's customers who live in the vicinity of the proposed Facility

1   and who have testified they are satisfied with Verizon's network coverage.  Dkt. 98

2   (Def. Opp. Trial Br.) at 5; Trial Exs. 10-14, 19, 30-44.  Defendant submitted maps that

3   plot the addresses of these residents against Verizon's coverage maps, two of which

4   are reproduced below.



25   Trial Ex. 30:009 (Theung Decl. Ex. 4) (the text "No coverage gap" appears in the

26   original exhibit).

27   / / /

28   / / /



Trial Ex. 30:011 (Theung Decl. Ex. 5) (the text "No coverage gap" appears in the original exhibit).[9]

Defendant's submitted resident declarations demonstrate these individuals wrote letters to oppose "strongly" the installation of the proposed Facility.  Trial Exs. 8-15, 31-44.  These residents have expressed concerns about the impact of the proposed Facility on their property values and the future development of the neighborhood, calling into question the credibility of their stated satisfaction with Verizon's existing network coverage.[10]  *See id*.  In sum, they are not disinterested

_____

[9] The colors displayed on this map do not correspond to the colors of Plaintiff's 2018 Coverage Map and Drive Test Map.  Here, green represents signals of -85 dBm or stronger, yellow represents signals of -90 dBm to -85 dBm, red represents signals of -95 dBm to -91 dBm, while pink represents signals of -100 dBm to -96 dBm.  In other words, the yellow and red portions of this map correspond to the yellow portions of Plaintiff's Coverage Map and Drive Test Map.  The proposed Facility is identified in purple on this map.

[10] These residents submitted their testimony through letters and declarations.  They did not appear as witnesses at trial and were never cross-examined regarding their experiences, and the court has not had the opportunity to observe their testimony or to

20

Verizon customers responding to a consumer survey regarding their network service and do not represent a statistical sample of Verizon's customers in the neighborhood. Furthermore, these residents reported in their declarations that they live in areas where Plaintiff estimates wireless signal strength to be -95 dBm to -105 dBm or stronger. *See* Trial Exs. 30-44. They all reside south of David Avenue and none live near Hillsboro Avenue, where the parties' drive tests reported the largest area of signals at -96 dBm or weaker.

The fact that approximately thirty individuals who strongly oppose the construction of the proposed Facility have submitted declarations stating they enjoy good coverage and are satisfied with Verizon's existing service is neither statistically nor scientifically meaningful and is insufficient to demonstrate there is no significant gap of coverage within the relevant geographic area.

In sum, the parties' evidence demonstrates there is a significant gap of in-building service coverage within the relevant area. Defendant's offered resident declarations are insufficient to demonstrate otherwise. This evidence of the lack of reliable in-building coverage strongly supports finding the existence of a significant gap in Verizon's service coverage.

### B.    In-Vehicle Coverage

Courts have additionally considered the effect of alleged gaps on commuters and highway traffic in determining their significance. *Palo Verdes*, 583 F.3d at 727. As previously stated, approximately 65-70% of the geographic area had signal strength weaker than -95 dBm, which both Blanchard and Afflerbach testified is the industry standard for in-vehicle coverage.

---

gauge their credibility. The court further notes their declarations, Trial Exs. 30-44, contain duplicative and/or substantially similar language and appear to have been drafted by or with the assistance of counsel. Accordingly, the court gives this testimony less weight than it would give to live testimony presented at trial under oath and subject to cross-examination.

1    Additionally, Plaintiff submitted evidence before the October 30, 2018 hearing,

2   regarding commuter traffic in the South Robertson Boulevard and Hillsboro

3   Avenue/Cadillac Avenue areas.  Trial Ex. 24:003-24:004.  According to the City's

4   Department of Transportation website, the South Robertson Boulevard area supported

5   a total of about 47,938 average daily trips and the Hillsboro Avenue/Cadillac Avenue

6   area supported a total of about 15,758 average daily trips.  Defendant does not dispute

7   these figures.  As indicated below, the parties' drive test maps and data show that

8   portions of both areas had signal strength below the industry standard for in-vehicle

9   coverage (-96 dBm to -105 dBm) and that portions of Hillsboro Avenue had signal

10   strength below the level at which "[Verizon's network] may not provide reliable in-

11   vehicle or outdoor coverage…" (-105 dBm).



Trial Ex. 24:015 (Plaintiff's Drive Test Map) (red arrows and text added).

/ / /



Trial Ex. 29:010 (Defendant's Drive Test Map) (yellow text and arrows added).

As with the in-building coverage discussed above, this evidence strongly supports finding a significant gap in Verizon's service coverage.

### C.   Dropped Calls and Reliability of Service

Plaintiff further contends that data on dropped calls indicates a significant gap in coverage in the area.  Dkt. 91 (Pl. Op. Trial Br.) at 20-21.  Plaintiff submitted a map of the locations of dropped calls Verizon observed during a one-week period in 2018, which is reproduced below.



Trial Ex. 24:016.

When the locations of the dropped calls are mapped against Plaintiff's 2018 Coverage Map, this figure shows that Verizon experienced the highest number of dropped calls in the northwestern portion of the map in the area of weakest averaged predicted signal strength. *See* Trial Ex. 24:017. In contrast, Verizon had few dropped calls near, and no dropped calls immediately adjacent to, the existing Oxen Corner and Castle Heights facilities in the southern and northeastern portions of the map, where the predicted coverage displays solid, contiguous areas with signals of -85 dBm or stronger (marked in green).

/ / /

/ / /

24



Trial Ex. 24:017 (Plaintiff's 2018 Coverage Map with Dropped Calls).

Although the parties did not map the dropped calls against their respective drive test maps, a visual comparison of the dropped calls against those maps shows that the dropped calls are largely clustered in or near areas with signal strength of -105 dBm or lower. *Compare* Trial Ex. 24:017 (Plaintiff's 2018 Coverage Map with Dropped Calls) *with* Trial Ex. 24:015 (Plaintiff's Drive Test Map) and Trial Ex. 29:010 (Defendant's Drive Test Map).

Plaintiff also submitted a RF coverage map of Verizon's predicted RF signal strength with the Hillsboro Facility in place. Trial Ex. 26:004 (Plaintiff's Expected Coverage Map).

/ / /



*Id.*

A comparison of the map of dropped calls with Plaintiff's Expected Coverage Map shows that most of the dropped call locations would be covered within the geographic area where the Hillsboro Facility would provide a signal of -85 dBm or stronger. *Compare* Trial Ex. 24:016 *with* Trial Ex. 26:004 (Plaintiff's Expected Coverage Map). Based on these two maps, the court finds the proposed Facility is reasonably likely to reduce the number of dropped calls within the green area of coverage (with a signal strength of -85 dBm or stronger) surrounding the Hillsboro Facility.

/ / /

1    Defendant cites *T-Mobile W. Corp. v. City & County of San Francisco* (*T-*
2  *Mobile SF*), 4:10-cv-03011-CW, 2011 U.S. Dist. LEXIS 14579, at *12 (N.D. Cal.
3  Feb. 14, 2011), to argue that courts have ruled in favor of defendant cities where a
4  plaintiff wireless telecommunications provider's own data showed that only 1,198
5  calls were dropped out of 470,903 calls that originated within the neighborhood in a
6  two-week period.  Dkt. 98 (Def. Opp. Trial Br.) at 20-21.  There, the parties cross-
7  moved for partial summary judgment on the plaintiff's claim that "the City did not
8  issue a decision in writing that is supported by substantial evidence," in violation of §
9  332(c)(7)(B)(iii) of the TCA.  *T-Mobile SF*, 2011 U.S. Dist. LEXIS 14579 at *1.  *T-*
10 *Mobile SF* did not consider or discuss claims under § 332(c)(7)(B)(i)(II), the
11 *Anacortes* test, or whether the defendant's denial decision constituted an effective
12 prohibition of service.  *See generally* 2011 U.S. Dist. LEXIS 14579.

13   Here, the court has already granted summary judgment in Defendant's favor on
14 Plaintiff's § 332(c)(7)(B)(iii) claim.  Dkt. 85 at 20.  *T-Mobile SF*, therefore, is
15 inapposite to the sole remaining issue of whether a significant gap in Verizon's
16 service coverage exists.

17   **D.    Access to Emergency Services**

18   According to Plaintiff, its RF engineer's analysis found that the proposed
19 Facility would remedy poor or no 4G LTE coverage in the area that adversely impacts
20 individuals' ability to place successfully an emergency call in the area.  Dkt. 91 (Pl.
21 Op. Trial Br.) at 20 (citing Trial Exs. 24:002, 24:010).  The cited exhibit states, in
22 relevant part:

23       As more of our voice calls move from CDMA to LTE, maintaining
24       good LTE coverage becomes more important for E911.  CDMA is
25       Verizon's 3G technology mostly used for voice calling and small data
26       usage.  LTE is 4G technology focusing more on high-speed data
27       transfer and, more recently, voice calling.  To provide better call
28       quality, voice calling, in the near future, will primarily be made using

27

1    LTE.  Also, upcoming phones will start being released as LTE-only.

2    If an area has poor or no LTE coverage, the likelihood of placing an

3    E911 call is greatly impacted.  The user would likely experience call

4    issues such as dropped calls and audio gaps and may not even be able

5    to make a call.

6    Trial Ex. 24:010.

7         Defendant, in turn, argues the proposed Facility is unnecessary because "under

8    federal law, a wireless telecommunications provider must transmit all wireless 911

9    calls, including those handled by another carrier."  Dkt. 98 (Def. Opp. Trial Br.) at 22

10   (quoting *T-Mobile SF*, 2011 U.S. Dist. LEXIS 14579, at *14, and citing 47 C.F.R. §

11   20.18(b)).  According to Defendant, "[t]here is no evidence to show that emergency

12   calls are not being adequately handled by Verizon's own service coverage or that of

13   other wireless telecommunications providers in the area."  *Id.*

14        The court agrees with Defendant that Plaintiff's evidence regarding Verizon's

15   ability to receive emergency 911 calls in the relevant area is speculative.  The RF

16   Engineer did not state that Verizon's network was unable to receive emergency 911

17   calls or present any facts to establish that Verizon customers attempting to make such

18   calls from LTE-only phones in the area would experience impacted service.  *See* Trial

19   Ex. 24:010.  Plaintiff also failed to produce evidence of the signal strength needed to

20   make such calls, and the court has no basis to determine whether it is the same or less

21   than the signal strength needed for 4G LTE service.

22        Verizon, thus, fails to demonstrate that its network suffers from significant gaps

23   that adversely impact its customers' ability to place emergency 911 calls.  Defendant,

24   however, similarly does not present any evidence to establish that Verizon or other

25   wireless telecommunications providers in the area provide adequate emergency 911

26   call services.  Accordingly, this factor neither supports nor weighs against a finding of

27   a significant gap in coverage.

28   / / /

28

### E.   Verizon's National Coverage Map

The City contends that Verizon's 2018 National Coverage Map ("NCM") states Verizon has "excellent" 4G LTE coverage in the relevant area, which casts doubt on the reliability of Verizon's claim of a significant gap.  Dkt. 98 (Def. Opp. Trial Br.) at 23 (citing Administrative Record ("AR") 11:1735).[11]

At trial, Blanchard testified the NCM is a more "general view" than the localized coverage maps (such as Plaintiff's 2018 Coverage Map) and is "about four times less detailed in the base analysis."  Blanchard further testified that it was his understanding that the national coverage map only shows the existence of outdoor 4G LTE coverage over a particular geographic area.

Plaintiff additionally submitted a letter by Gregory D. Curry ("Curry"), Plaintiff's Manager of Marketing Operations, in which Curry stated Verizon's network coverage maps on its websites show predicted network coverage based on expected RF propagation, but do not make a guarantee of coverage.  Trial Ex. 24:020-21.  According to Curry, Verizon's website also contains a Coverage Disclaimer, which states in relevant part:

> These maps are not a guarantee of coverage and contain areas of no service, and are a general prediction of where rates apply based on our internal data.  Wireless service is subject to network and transmission limitations, including cell site unavailability, particularly near boundaries and in remote areas.  Customer equipment, weather, topography and other environmental considerations associated with

---

[11] Although the parties did not enter the NCM into evidence as a trial exhibit, the parties' discussion and testimony suggests they are referring to the coverage map accessible through Verizon's website, a copy of which was attached to Trial Exhibit 38 (Grinblat Decl. Exs. 1-2).  Accordingly, the court will assume this website map is the NCM.  *See* Trial Ex. 24:020 ("Verizon's website maps show that the company has 4G LTE coverage around the Hillsboro site.  Those website maps, however, represent general network coverage capabilities….").

1   radio technology also affect service and service may vary significantly

2   within buildings.  Some information on service [is from] outside the

3   Verizon Wireless proprietary network, and we cannot vouch for its

4   accuracy.

5   *Id.*

6         Defendant did not present any evidence to demonstrate the NCM is a more

7   accurate representation of Verizon's network coverage than Plaintiff's 2018 Coverage

8   Map or the parties' drive test maps, or to establish that Verizon made such a

9   representation.  Similarly, Defendant did not refute Plaintiff's evidence of the

10   Coverage Disclaimer.  Accordingly, while Verizon's statement and representation via

11   the NCM that it had "excellent" 4G LTE service in the relevant area stands as

12   evidence against the existence of a significant gap, the NCM is not determinative of

13   the issue in light of the stronger evidence presented by both parties.

14   **VI.   Conclusions of Fact Regarding Coverage**

15         Based on Plaintiff's 2018 Coverage Map, Plaintiff's Drive Test Map, and

16   Defendant's Drive Test Map and underlying data, and the testimony of the parties'

17   expert witnesses Blanchard and Afflerbach, and after considering all additional

18   evidence presented by the parties, the court finds Plaintiff has proven by a

19   preponderance of the evidence the existence of a significant gap in Verizon's service

20   coverage in the geographic area near the proposed Hillsboro Facility.

21   <u>CONCLUSIONS OF LAW</u>

22   **I.   Plaintiff's Effective Prohibition Claim**

23         A locality violates the effective prohibition clause if it prevents a wireless

24   provider from closing a "significant gap" in coverage.  *Anacortes*, 572 F.3d at 995.

25   As stated, an effective prohibition claim "involves a two-part analysis requiring (1)

26   the showing of a 'significant gap' in service coverage and (2) some inquiry into the

27   feasibility of alternative facilities or site locations."  *Id*.

28

In its September 1, 2020 order on the parties' cross-motions for summary judgment, the court granted partial summary judgment in Plaintiff's favor and against Defendant on the second prong of the *Anacortes* test, finding: (1) Verizon made a prima facie showing that the proposed Facility was the least intrusive means to remedy the claimed, significant coverage gap identified by Verizon and that Verizon had identified and considered alternatives; and (2) that the City failed to meet its burden to rebut Verizon's prima facie showing by identifying a suitable alternative to the proposed Facility.  Dkt. 85 at 28-31.

As the court now finds the evidence demonstrates the existence of a significant gap in Verizon's service coverage in the relevant area, the court holds the Denial Decision had the effect of prohibiting Verizon's provision of personal wireless service in violation of § 332(c)(7)(B)(i)(II).  The court, therefore, GRANTS Judgment in Plaintiff's favor on the second and fourth causes of action.

## II.    Plaintiff's Request for Injunctive Relief

Plaintiff seeks a writ of mandate requiring the City to set aside, vacate, and rescind the Denial Decision and an injunction requiring the City to issue all permits and approvals required for the proposed Facility.  FAC Prayer ¶¶ 5-6; Dkt. 91 (Pl. Op. Trial Br.) at 25.

While Defendant recognizes that injunctive relief is available for violations of the TCA, the City argues that Verizon is not automatically entitled to injunctive relief and that the court should remand this action to the South LA APC to allow the City and Verizon to work cooperatively on designing a better version of the proposed Facility.  Dkt. 98 (Def. Opp. Trial Br.) at 23-24.

It has been nearly seven years since Verizon filed its original application to construct and operate a facility at this location, in November 2014.  After the City denied the original proposal, Version filed the instant action, reached a settlement with the City, submitted a revised application after discussions with ZA Weintraub, and obtained an initial approval through the City's planning process.  Over two and a half

additional years have passed since the South LA APC denied Plaintiff's revised application on appeal.  Remanding this action would only further delay Verizon's ability to construct and operate the Hillsboro Facility and enable the City and the residents who oppose the proposed Facility further opportunities to undermine approval of the 2017 Project Application.

In contrast, the LADCP already approved the 2017 Project Application once, and Defendant does not identify any specific improvements that are needed.  *See generally* Dkt. 98 (Def. Opp. Trial Br.).  A remand would also conflict with Congress's clearly stated intent that effective prohibition claims be heard and decided on an expedited basis.  *See* 47 U.S.C. § 332(c)(7)(B)(v).

Accordingly, the court DENIES Defendant's request for a remand, finding the potential benefits of a remand would be greatly outweighed by the certainty of additional delay.

## RULING

For the reasons stated herein, the court finds the City's Denial Decision violated § 332(c)(7)(B)(i)(II) of the TCA by effectively prohibiting Verizon's ability to fill a significant gap in its service coverage and provision of 4G LTE wireless services.  Plaintiff, therefore, is entitled to Judgment in its favor on the second and fourth causes of action of the FAC.

The court GRANTS Judgment in Plaintiff's favor and ISSUES (1) a Writ of Mandate under Cal. Code Civ. Proc. § 1094.5 ORDERING the City of Los Angeles to set aside, vacate, and rescind the Denial Decision, and (2) an Injunction ORDERING the City to issue promptly all permits and other approvals, along with all other permits and environmental review approval authorizations, necessary to allow Verizon to proceed with the placement, installation, construction, and operation of the proposed Facility, as set forth in the 2017 Project Application.

/ / /

/ / /

Plaintiff shall file a proposed Judgment within 21 days of this ruling, which accurately states the court's rulings and complies with all statutory requirements and court rules, including Fed. R. Civ. P. 65(d).

IT IS SO ORDERED.

Dated: August 24, 2021

FERNANDO L. AENLLE-ROCHA
United States District Judge